640 F.2d 392
 106 L.R.R.M. (BNA) 2462, 205 U.S.App.D.C. 306,
90 Lab.Cas. P 12,513
 TEAMSTERS LOCAL 115, a/w International Brotherhood of
Teamsters, Chauffeurs, Warehousemen and Helpers of
America, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Haddon House Food Products, Inc. and Flavor Delight, Inc.,
Intervenors.
HADDON HOUSE FOOD PRODUCTS, INC. and Flavor Delight, Inc., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Teamsters Local Union No. 115, Intervenor.
 Nos. 79-1619, 79-2018.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 27, 1980.
Decided Jan. 26, 1981.
 
 Jonathan G. Axelrod, Bethesda, Md., with whom Hugh J. Beins, Washington, D. C., was on the brief, for petitioner in No. 79-1619 and intervenor in No. 79-2018.
 Julius M. Steiner, Philadelphia, Pa., with whom Stephen J. Cabot and Jerald Cureton, Philadelphia, Pa., were on the brief, for petitioners in No. 79-2018 and intervenors in No. 79-1619.
 Anton Hajjar, Atty., N. L. R. B., Washington, D. C., of the Bar of the Supreme Court of Louisiana pro hac vice by special leave of Court, with whom Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., were on the brief, for respondent.
 William J. Curtin and Stephen A. Bokat, Washington, D. C., were on the brief, for amicus curiae urging that the Board order should be upheld.
 Before LUMBARD*, Senior Circuit Judge for the United States Court of Appeals for the Second Circuit, and MIKVA and GINSBURG, Circuit Judges.
 Opinion for the Court filed by Circuit Judge MIKVA.
 MIKVA, Circuit Judge:
 
 
 1
 Haddon House Food Products, Inc., is a small wholesale distributor, owned and managed by one Harold Anderson. Flavor Delight, Inc., is an even smaller spice company, owned and managed by his son, David Anderson. Together, the two companies are the Employer in this proceeding seeking review of an order of the National Labor Relations Board (Board).
 
 
 2
 On November 13, 1975, Local Union 115 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Union) commenced an organization drive among the employees of the Employer. On the following morning, two employees who had been active in the Union drive were summarily fired, as were two other employees who had signed Union authorization cards. Later that same day, three other cardsigners were laid off.
 
 
 3
 The conflict triggered by these events formed the basis of a complaint issued by the Board's general counsel, charging a number of violations of the National Labor Relations Act (Act). After a hearing, an Administrative Law Judge (ALJ) found that the Employer was guilty of an "outrageous and pervasive" system of unfair labor practices. Although the ALJ found that the Union had never obtained authorization cards from a majority of the employees in the bargaining unit, he nevertheless recommended that the Board issue a bargaining order because the Employer's conduct had been so pervasive and coercive that a fair election could not be held in the foreseeable future. The Board accepted and extended the ALJ's findings of unfair labor practices, but was sharply divided on the bargaining order remedy recommended by the ALJ, and ordered instead a variety of alternative remedies.[1] The Union and the Employer each petitioned for review, and the Board cross-petitioned for enforcement. For reasons set forth in this opinion, we are prepared to enforce the Board's order only if one of the remedies proposed therein is modified.
 
 I. UNFAIR LABOR PRACTICE FINDINGS
 
 4
 There is little dispute that the conduct engaged in by the Employer to abort the Union's organizing effort was egregious and effective. The Employer promised benefits to induce the employees to avoid the Union, and both threatened and carried out discharges and layoffs as a penalty for union activity. After the fired workers began picketing, the Employer initially offered them reinstatement.[2] When they sought to accept the offer, after a few days' delay, the strikers were met by security guards and dogs who denied them entrance to the plant. While the ALJ did not consider the denial of reinstatement an unfair labor practice, the Board did. This is the only unfair labor practice finding challenged on appeal,[3] and we conclude that there was ample evidence in the record to sustain the Board's determination.
 
 
 5
 Unfair labor practice strikers those whose absence from the workplace is prompted by employer conduct that is found to constitute an unfair labor practice are entitled to reinstatement if they make an unconditional offer to return to work. N.L.R.B. v. International Van Lines, 409 U.S. 48, 93 S.Ct. 74, 34 L.Ed.2d 201 (1972). The ALJ found that the strikers' offer was conditional because they had resolved not to return unless they were all taken back. The Board, however, found that the Employer's reason for denying reinstatement had nothing to do with that condition; indeed, the Employer was unaware of any condition when the employees sought to return. The Employer denied them reinstatement, the Board found, because they had not met the deadline set in the Employer's offer of reinstatement. Reinstatement conditioned on such a deadline is not the reinstatement to which these employees were entitled under the Act.
 
 
 6
 The testimony in the record amply supports the Board's finding that the Employer denied reinstatement because its deadline had not been met. And the law amply supports the Board's conclusion that, having denied reinstatement for invalid reasons of its own, the Employer cannot now claim that a subjective resolve of the strikers, never communicated to the Employer, robbed the employees' return of its unconditional nature. The actual basis of the Employer's conduct is determinative. See, e. g., Lodges 743 & 1756, International Association of Machinists v. United Aircraft Corp., 534 F.2d 422, 458 n.61 (2d Cir. 1975), cert. denied, 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976); Snow v. N.L.R.B., 308 F.2d 687 (9th Cir. 1962).
 
 
 7
 The Board's unfair labor practice rulings were well-founded. Indeed, the record convinces us that the Employer's conduct constituted "a well-orchestrated antiunion campaign that featured repeated and egregious violations ... of the Act," J.A. 59 (concurring opinion of Chairman Fanning and Member Jenkins). The hard question is how to remedy such conduct in the case at bar.
 
 II. THE MINORITY STATUS OF THE UNION
 
 8
 Where a union has enjoyed the support of a majority of the employees in the bargaining unit, the Board's remedies for serious employer misconduct frequently include an order directing the Employer to bargain with the union. In the instant case, however, the record does not support the Union's contention that it had achieved majority status. The parties agree that the Union had obtained twenty-seven authorization cards signed by employees. The Board found that there were more than fifty-three workers in the bargaining unit, so that twenty-seven cards cannot demonstrate majority support.
 
 
 9
 The ALJ had found at least fifty-nine employees in the unit. The Board concluded that the ALJ had counted three employees twice, and so found that there were at least fifty-six employees in the unit. Our own inspection of the record suggests that a fourth employee may have been counted twice.[4] Even so, the Union was at least one card short of majority status.
 
 
 10
 The Union claims that these figures include three other employees who should have been excluded from the unit because they were supervisors within the meaning of the Act. We turn to that contention.
 
 
 11
 Section 2(3) of the Act excludes from the statutory definition of employee "any individual employed as a supervisor." 29 U.S.C. § 152(3) (1976). Section 2(11) in turn defines supervisor as
 
 
 12
 any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.
 
 
 13
 29 U.S.C. § 152(11) (1976). This court has reminded litigants that application of this definition requires an attentive eye to the realities of the workplace and not a "wooden reading," since "(a)lmost any employee 'directs' other employees in some fashion at some time." Food Store Employees Local 347 v. N.L.R.B., 422 F.2d 685, 690 (D.C.Cir.1969). Moreover, accurate estimation of supervisory status is a factual judgment facilitated by the expertise of the Board, and "(t)he substantial evidence standard for review of agency fact determinations ... takes on special significance where the issue lies so squarely within the Board's ambit of expertise." Oil, Chemical and Atomic Workers v. N.L.R.B., 445 F.2d 237, 241 (D.C.Cir.1971), cert. denied, 404 U.S. 1039, 92 S.Ct. 713, 30 L.Ed.2d 730 (1972) (citation omitted).
 
 
 14
 We begin with the Union's challenge to the Board's finding that Angelo Patelo is not a Flavor Delight supervisor. The record shows that, although he is paid more than some fellow employees, other rank-and-file workers earn more than he does. While he occasionally communicates orders from management, he does not have other supervisory, disciplinary, or hiring powers. He performs manual work side by side with other employees. These are hardly the facts on which the Board's determination can be overturned. The same is true regarding John Morrow, the Employer's oldest employee and one who may have had some authority at some time in the past. Partly because of his age, Morrow has trained another employee, Paul Masi, to take over his major responsibilities. The ALJ concluded that whatever authority Morrow had once exercised was now exercised by Masi, and that such authority did not suffice to make either of these men a supervisor.[5] Finally the Union challenges Michael Diamond as a supervisor; the Board found that, although he may have routed some trucks on occasion, he was essentially serving as a truck driver. In each of these instances, the Board's conclusions on a record of conflicting claims are well within the measure of the substantial evidence test.
 
 
 15
 In addition, the Union has challenged the inclusion in the unit of Paul Berman, son of the general supervisor Jack Berman. As the Union pointed out at oral argument, it is difficult to identify the qualities that distinguish Paul Berman from an executive's daughter who was ruled ineligible for inclusion in a bargaining unit in a recent Board case. See Pandick Press Midwest, Inc., 251 N.L.R.B. No. 58, 105 L.R.R.M. 1161 (1980). Certainly neither the ALJ nor the Board relied on any factor that would assist us in reconciling these decisions. While every case turns on its own facts, the Board cannot apply distinctions whimsically. It is not necessary, however, to decide whether this employee should be a unit member, since there are fifty-four workers in the unit even if he is excluded. The Union had cards from only twenty-seven, and half a unit is not a majority. See N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 581 n.2, 89 S.Ct. 1918, 1923 n.2, 23 L.Ed.2d 547 (1969). We agree with the Board that the Union never demonstrated the majority status under the Act that would make a bargaining order appropriate under Board precedents. We must therefore go on to consider the entire gamut of remedy issues presented by this case.
 
 
 16
 III. THE BOARD'S REFUSAL TO ISSUE A BARGAINING ORDER
 
 
 17
 The ALJ recommended that the Board order the Employer to recognize and bargain with the Union, despite the fact that the Union had never demonstrated majority status. The ALJ found this remedy necessary because he saw no "rational expectation that a fair election among the employees can possibly take place in the foreseeable future." J.A. 36. He may be right, and the Employer's conduct may have so poisoned the well that traditional democratic processes of election and designation by authorization cards are no longer viable options. But the Board has never issued a bargaining order in favor of a union without a showing that, at least at one time, the union had the support of a majority of the employees in the unit, and the Board was unwilling to order such relief in this case. We uphold the Board's refusal.
 
 
 18
 There is language in one Supreme Court opinion suggesting that the Board's power to fashion remedies might extend to such an order. This dictum appears in N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), where the Court approved the Board's practice of issuing bargaining orders when the majority support of a union, as demonstrated by a showing of authorization cards, had been dissipated by serious unfair labor practices. The Court's discussion of remedial options made reference to three categories: category three included violations not serious enough to warrant a bargaining order because an election could still be held; category two included conduct tending "to undermine majority strength and impede the election processes;" and category one included conduct so "outrageous" and "pervasive" that a fair and reliable election would be impossible. The Court held that the Board could impose a bargaining order in category two cases if a card majority had been shown, and mentioned without apparent disapproval a Fourth Circuit dictum suggesting that bargaining orders in category one cases would not require a majority showing. 395 U.S. at 613-14, 89 S.Ct. at 1939-40. Since that time, commentators have hotly debated the extent of the Board's power in category one cases.[6]
 
 
 19
 As indicated above, the Board has never granted such a bargaining order. The Board Members announced different rationales for their restraint in this case, and the Union focuses on their disagreement as necessitating a remand. Two Members of the Board agreed with the ALJ that a bargaining order was necessary. Two other Members were of the opinion that, while such an order might be appropriate in some circumstances, this was not such a case. Finally, Member Penello did not believe that the Board was ever authorized to issue a bargaining order in favor of a union that had never obtained the adherence of a majority. Since his was the determinative vote, the Union argues that the Board did not fully exercise its judgment, and asks us to remand the case to the Board after holding that Member Penello has been misled by an error of law. This request is, of course, premised on our agreeing that a bargaining order is proper for a minority union in some cases. We are not so sure we agree, and, in any event, are not prepared to fill in the interstices of Gissel on the facts of this case.
 
 
 20
 It is true that Member Penello, in providing the vote necessary to the majority decision on this point, opined that the Board should never order an employer to bargain with a minority union. In stating his views, he referred to his opinion in United Dairy Farmers Cooperative Association, 242 N.L.R.B. No. 179, 101 L.R.R.M. 1278 (1979), remanded, 633 F.2d 1054 (3d Cir. 1980).[7] In that exposition, he explored the subject at length, emphasizing his belief that the majority rule principle of section 9(a) of the Act was too fundamental to be sacrificed. He insisted that his fellow Members' resolution of the conflict between majority rights and remedial needs was fraught with danger for employee freedom of choice. He claimed that the congressional intent expressed in the statute precluded bargaining orders for minority unions and, as his arguments demonstrate, this perceived legislative policy judgment coincided with his own.
 
 
 21
 In an appropriate case this court may have to confront squarely the dilemma raised by Member Penello. This is not, however, a confrontation to be precipitated hastily, involving as it does the danger of unjustifiably imposing a bargaining representative against the will of the employees. The free choice of the employees is best determined through the inexorable logic of a secret ballot election. The Supreme Court has recognized that "the election process ha(s) acknowledged superiority in ascertaining whether a union has majority support," Linden Lumber Division v. N.L.R.B., 419 U.S. 301, 304, 95 S.Ct. 429, 431, 42 L.Ed.2d 465 (1974). Where employer misconduct has destroyed the possibility of a free election, the Court has approved the Board's reliance on authorization cards as "the most effective perhaps the only way of assuring employee choice," Gissel, 395 U.S. at 602, 89 S.Ct. at 1934. But for a government body to bypass the employees altogether, and impose a bargaining representative merely on the basis of its own assessment of the employees' needs, would pose a serious threat to employee freedom of choice.
 
 
 22
 We do not believe that such a conundrum should be resolved, even preliminarily, in the abstract. We are being urged to decide this important question merely in order to remand this case to the Board so that Member Penello can restate in slightly different terms the concerns that he has already expressed. We decline to do so. The Board has sufficiently articulated its conclusion that, whether or not this remedy may be justified in some hypothetical situation, a majority of the Board agrees that it is not appropriate in this case.
 
 IV. THE BOARD'S REMEDIAL ORDER
 
 23
 We turn at last to the actual remedies imposed by the Board. The Employer challenges most of these as improper or unnecessary. Before reaching the merits of the Employer's arguments, we must consider whether a procedural obstacle bars the Employer from raising them.
 
 A. The Procedural Hurdle
 
 24
 When the Board rejected the ALJ's recommendation of a bargaining order, it substituted an extensive list of alternative remedies. Neither the general counsel nor the Union as charging party had taken exception to the ALJ's failure to impose these remedies. When they finally appeared in the Board decision, the Employer did not petition for reconsideration.
 
 
 25
 The Board argues that this court is precluded from hearing the Employer's objections, even though these remedies were imposed sua sponte by the Board, because section 10(e) of the Act provides that "(n)o objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e) (1976). It has been observed that this requirement "affords the Board the opportunity to bring its labor relations expertise to bear on the problem so that (the court) may have the benefit of its opinion when we review its determinations." N.L.R.B. v. Allied Products Corp., 548 F.2d 644, 654 (6th Cir. 1977). And it has been held that mere sua sponte adoption of a remedy does not in itself amount to the "extraordinary circumstances" required by the statute, because reconsideration is available at the Board level. Id. at 655.
 
 
 26
 We think that the plight of this Employer is different, however, because the Employer's objections to Board-designed remedies became entangled with the Union's petition for review of the Board decision and the Board's cross-petition for enforcement. The Board issued its decision on June 12, 1979, and the Union filed its petition for review with this court on June 14. Once the Union's petition was filed, the Board became obligated to file the record with the reviewing court, and that court acquired jurisdiction to enforce the Board's order. Act § 10(f), 29 U.S.C. § 160(f) (1976). Once the record was filed, our jurisdiction became exclusive, and the Board no longer had any authority to reconsider its decision without a specific remand from this court.
 
 
 27
 If an employer is barred from presenting his objections to the reviewing court in such circumstances, then the court faces a Hobson's choice between enforcing the Board order without contest, and remanding the case in its entirety to give the employer an opportunity to make the ritual application for reconsideration. The unfairness of the former course is evident, and the inefficiency of the latter course would prevent the Union from seeking review until the Employer has exhausted his administrative remedies. We do not believe that such a jurisdictional conflict between the court and the Board was intended by Congress, and we find it inconsistent with orderly judicial review. We consider it preferable to hold that, after sua sponte adoption of new remedies by the Board, the filing of a petition for judicial review by another aggrieved party can constitute the extraordinary circumstances that "preven(t) a matter which should have been presented to the Board from having been presented at the proper time." N.L.R.B. v. Allied Products Corp., 548 F.2d at 654. We point out that the Union filed its petition first in this case; our holding is limited to this sequence, and might be different if the Employer had successfully engaged in the all-too-frequent race to the courthouse.
 
 B. The Board's Remedial Powers
 
 28
 The Board's choice of remedies is entitled to a high degree of deference. Congress was aware at the time of the Board's creation that the tangled employer-employee disputes arising from the substantive commands of the Act would demand a body with broad remedial powers. Section 10(c) of the Act directs the Board to issue an order requiring guilty parties "to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement ... as will effectuate the policies of the Act." 29 U.S.C. § 160(c)(1976). With that kind of mandate, it is not surprising that the Supreme Court has consistently stressed that the Board's remedial power "is a broad, discretionary one, subject to limited judicial review." Fibreboard Paper Products Corp. v. N.L.R.B., 379 U.S. 203, 216, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964). In fashioning its remedies, "the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts." N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 612 n.32, 89 S.Ct. 1918, 1939 n.32, 23 L.Ed.2d 547 (1969).
 
 
 29
 In the present case, the ALJ concluded that "the unfair labor practices to which this Respondent resorted to kill off the union campaign with finality violent and outright discharge of seven persons within hours of the birth of the union campaign were 'so outrageous and pervasive' " that extraordinary measures were needed. J.A. 36. The Board agreed that the violations were "numerous and egregious," J.A. 47, but balked at the bargaining remedy the ALJ had proposed. It then undertook the difficult task of formulating a set of remedies that would restore the employee confidence necessary to permit a free and untrammeled representation decision.
 
 
 30
 The Board imposed a series of remedial actions, designed to reassure interested parties of their rights and to assist the employees in hearing the Union's side of the story despite the "lingering atmosphere of fear" the Employer had created. J.A. 51. None of these actions are unprecedented; some are quite traditional. Yet, in the circumstances of this case, the efficacy of any one of the remedies standing alone is doubtful. We should not be quick to conclude that the presence of some remedies renders other superfluous. The Supreme Court has directed that the Board's order "not be disturbed 'unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.' " Fibreboard Paper Products Corp. v. N.L.R.B., 379 U.S. 203, 216, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964) (quoting Virginia Electric & Power Co. v. N.L.R.B., 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943)).
 
 
 31
 Nevertheless, the Employer attacks the entire remedial scheme, arguing that it is not J.P. Stevens & Co., and that only a record of hardened recidivism could justify so much affirmative action. But an employer who strikes the first blow hard enough may not need to strike another. The measure of the Board's remedial power cannot depend solely on the length or frequency of the Employer's conduct: the crucial factor is the effect of that conduct on the employees.[8]
 
 
 32
 Turning to the individual remedial steps ordered, we find that they can be loosely grouped into two classes: access remedies and notice remedies. The access remedies are designed to assist the Union in communicating with the employees, and to assist the employees in hearing the Union's side of the story without fear of retaliation. The notice remedies are intended to inform the employees of their statutory rights and the legal limits on the Employer's conduct, and to reassure them that further violations will not occur. We address each class of remedies in turn.
 
 C. Access Remedies
 
 33
 The Board ordered the Employer to grant the Union access to company bulletin boards and other posting places for a two-year period, to make available to the Union a list of the names and addresses of its current employees, to give Union spokesmen reasonable access to nonwork areas during nonwork periods, to grant the Union equal time if the Employer convenes its employees for a "captive audience" speech on union representation, and to allow the Union to make one 30-minute preelection speech if there is a Board election involving the Union. The Employer makes two general arguments against this set of remedies. The first is that access remedies of any kind are unwarranted, because the record demonstrates that the Union successfully engaged in direct employee solicitation without interference by the Employer. This argument flies in the face of the Board's findings that the Employer had fired employees for their union activities, warned workers not to associate with union adherents, and fired one employee for chatting with members of the picket line.
 
 
 34
 The Employer next cites N.L.R.B. v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956), and its progeny,[9] as authority for the proposition that the Employer's property rights preclude union access to the property unless there are no other reasonable means of reaching the employees. But none of these cases deal with the remedial powers of the Board; they only seek to determine when an employer's denial of access to his property can itself be deemed an unfair labor practice, see Decaturville Sportswear Co. v. N.L.R.B., 406 F.2d 886, 889 (6th Cir. 1969).
 
 
 35
 Some of these remedies are severe, but they are not new departures. See, e. g., Oil, Chemical and Atomic Workers v. N.L.R.B., 547 F.2d 575 (D.C.Cir.1976), cert. denied, 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062 (1977) (bulletin boards); Food Store Employees Local 347 v. N.L.R.B., 476 F.2d 546 (D.C.Cir.1973), rev'd on other grounds, 417 U.S. 1, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974) (names and addresses); Montgomery Ward & Co. v. N.L.R.B., 339 F.2d 889 (6th Cir. 1965) (right to reply to captive audience speech); N.L.R.B. v. Crown Laundry & Dry Cleaners, Inc., 437 F.2d 290 (5th Cir. 1971) (pre-election speech).[10] We cannot say that they constitute "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act."
 
 D. Notice Remedies
 
 36
 The Employer concedes the propriety of requiring posting of copies of the Board's notice at the Employer's premises. But the Employer challenges every other remedial step designed to communicate the contents of that notice to interested parties, and to reassure them that their rights will be respected. The Employer objects to mailing copies of the notice to employees and former employees at their homes, finding it duplicative and punitive. This objection need not detain us long. "An employee who must scan the Board's notice hurriedly while at work, under the scrutiny of others, will not be as able to absorb its meaning and hence to understand his legal rights as one who reads it at home in a more leisurely fashion." J.P. Stevens & Co. v. N.L.R.B., 380 F.2d 292, 304 (2d Cir.), cert. denied, 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600 (1967). Even more demanding than the needs of current employees are the needs of the former employees who were the direct victims of the Employer's violations; posting the notice at the plant hardly serves to communicate its contents to them.
 
 
 37
 The Employer also objects to the requirement that the notice be reprinted in appropriate company publications. Such an order is not an innovation. See, e. g., N.L.R.B. v. Weirton Steel Co., 183 F.2d 584 (3d Cir. 1950). The Board deems it necessary to convince the employees that the Employer has adopted an official policy of complying with its legal obligations, and it is certainly within the permissible range of Board options.
 
 
 38
 The same response must be made to the Employer's objection to the requirement that the Board notice be reprinted in newspapers of general circulation in the vicinity. Neither the concern about unfavorable publicity nor the expense would justify the court in overturning this aspect of the Board order. As the First Circuit has observed,
 
 
 39
 The further requirement that the notices be published in all newspapers of general circulation helps insure that all interested persons will receive notice.... Moreover, where the violations are flagrant and repeated, the publication order has the salutary effect of neutralizing the frustrating effects of persistent illegal activity by letting in "a warming wind of information and, more important, reassurance."
 
 
 40
 N.L.R.B. v. Union Nacional de Trabajadores, 540 F.2d 1, 12 (1st Cir. 1976), cert. denied, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977) (citations omitted).
 
 
 41
 A more serious objection raised by the Employer concerns the Board requirement that the Haddon House president, Harold Anderson, personally read a copy of the notice to an assembly of the employees. The Employer urges that such a requirement is degrading and "demonstrates that the Board is intent on its design to humiliate and embarrass the Petitioner." It is true that the Board's powers are limited to remedial, and not punitive, orders. But we do not think that the record justifies any suspicion that the Board has displayed a vindictive animus toward the Employer, and we must view the order as remedial, not punitive, if it can reasonably be said to effectuate the purposes of the Act.
 
 
 42
 Unlike other circuits, this court has never enforced a Board public reading order. We find it necessary, therefore, to examine in some detail the history of the oral notice requirement. This inquiry leads us to conclude that public reading by management is a permissible remedy, but that the Board has gone too far by singling out Harold Anderson as the individual who must perform the reading.
 
 
 43
 The Board's original rationale for oral reading by management was to ensure effective communication of the substance of the notice, and these provisions were often justified by employee illiteracy. In the earliest cases, oral notice provisions were enforced without comment. Jackson Tile Manufacturing Co., 122 N.L.R.B. 764 (1958), enforced, 272 F.2d 181 (5th Cir. 1959); Taylor-Colquitt Co., 47 N.L.R.B. 225 (1943), enforced, 140 F.2d 92 (4th Cir. 1943). But in N.L.R.B. v. Laney & Duke Storage Warehouse Co., 369 F.2d 859 (5th Cir. 1966), a court refused to enforce such a provision. In Laney & Duke, the ALJ had ordered the employer to read the notice to any employee who requested it, but the Board had expanded this to require a reading to all employees, singly or collectively, whether or not requested. The Fifth Circuit denied enforcement because it considered this remedy "unnecessarily embarrassing and humiliating to management rather than effectuating the policies of the Act." Id. at 869. This decision did not, however, preclude other panels of the Fifth Circuit from enforcing public reading orders where the illiteracy of the employees appeared to require it. N. L. R. B. v. Bush Hog, Inc., 405 F.2d 755 (5th Cir. 1968); N.L.R.B. v. Texas Electric Cooperatives, Inc., 398 F.2d 722 (5th Cir. 1968).
 
 
 44
 Meanwhile, the Second Circuit developed a compromise device: the Board order was modified to permit reading of the notice by either the employer or a Board representative, at the option of the employer. The court was satisfied that such a reading "still guarantees effective communication of the Board's order to the Company's employees." J.P. Stevens & Co. v. N.L.R.B., 380 F.2d 292, 305 (2d Cir.), cert. denied, 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600 (1967). The Board acquiesced in such a modification in a subsequent case, acknowledging that a public reading by a Board representative sufficed to effectuate the policies of the Act. Textile Workers v. N.L.R.B., 388 F.2d 896 (2d Cir. 1967), cert. denied, 393 U.S. 836, 89 S.Ct. 112, 21 L.Ed.2d 107 (1968). Finally, the Board itself adopted the Second Circuit's strategy, including this option in its own orders. See J.P. Stevens & Co., 167 N.L.R.B. 258 & n.2 (1967), enforced in relevant part, 406 F.2d 1017 (4th Cir. 1968).
 
 
 45
 This court, however, has viewed public reading requirements with far more suspicion. In International Union of Electrical, Radio & Machine Workers v. N.L.R.B., 383 F.2d 230, 232-33 (D.C.Cir.1967), cert. denied, 390 U.S. 904, 88 S.Ct. 818, 19 L.Ed.2d 871 (1968), we rejected a public reading by the employer as "inappropriate to achieve the sought-after goal of dissemination of information concerning employees' rights." The court did acknowledge that a public reading order might be appropriate in some circumstances, but found its disadvantages outweighed the usefulness of "yet a fourth promulgation of the order" in that case. Id. at 232. It also rejected the alternative of a reading by a Board representative because that could diminish the Board's apparent neutrality, and "creat(e) a problem more severe than the one it supposedly solves." Id. at 233 n.5.
 
 
 46
 Notwithstanding this court's reluctance, other circuits generally approved the public reading order once the Board representative option became routine. See J.P. Stevens & Co. v. N.L.R.B., 441 F.2d 514 (5th Cir.), cert. denied, 404 U.S. 830, 92 S.Ct. 69, 30 L.Ed.2d 59 (1971); Marine Welding and Repair Works, Inc. v. N.L.R.B., 439 F.2d 395 (8th Cir. 1971); J.P. Stevens & Co. v. N.L.R.B., 406 F.2d 1017 (4th Cir. 1968). The dormant issue of readings by the employer himself was revived, however, when the Board began to advocate public reading of the notice for other purposes. The Fifth Circuit has praised the public reading order as "an effective but moderate way to let in a warming wind of information and, more important, reassurance," J.P. Stevens & Co. v. N.L.R.B., 417 F.2d 533 (5th Cir. 1969), and it is this reassurance function that the Board has recently emphasized to justify the requirement of a reading by management itself.
 
 
 47
 In United Dairy Farmers Cooperative Association, 242 N.L.R.B. No. 179, 11 n.14, 101 L.R.R.M. 1278, 1281 n.14 (1979), remanded on other grounds, 633 F.2d 1054, (3d Cir. 1980), the Board acknowledged judicial doubts about the propriety of such an order, but concluded that the company itself must give its employees "reassurances that this campaign will end." In the present case, the Board also invoked this rationale to justify its order of a public reading without the Board representative option. Given this different function, it is obvious that a reading by a delegate of the Board rather than by management would not be sufficient.[11]
 
 
 48
 The Board's remedy is admittedly strong medicine. But in the context of the severely chilling environment created by this Employer's unfair labor practices, we cannot say that it was superfluous to the cure. This is not a mere "additional" promulgation of the notice's contents, but rather a deliberate attempt to alleviate the workers' fears about the Employer's intentions. The reading can do little to disrupt the already strained relationship between the Employer and the Union, and it may be of substantial benefit to the employees. Whether or not this hope is realized, we cannot say that the Board was wrong to make an effort in that direction. This court acknowledged in International Union of Electrical, Radio & Machine Workers that there were conceivably cases where the need for the remedy would outweigh its oppressiveness and justify the public reading order. We believe that this is such a case.
 
 
 49
 One feature of the public reading order is highly unusual, however, and presents a special problem for enforcement by this court. That is the requirement that the notice be read by a specified individual Harold Anderson, the president and owner of Haddon House. We are aware of only one other case in which the Board singled out a particular individual to perform the reading, and we observe that in the ensuing enforcement action, a procedural obstacle preventing the court from reaching the merits of the employer's challenge.[12] United Dairy Farmers Cooperative Association, 242 N.L.R.B. No. 179, 101 L.R.R.M. 1278 (1979), remanded, 633 F.2d 1054 (3d Cir. 1980). In United Dairy Farmers, the Board emphasized the personal participation of the respondent's president in numerous unfair labor practices. He had
 
 
 50
 personally announced that employees would have to become "independent contractors" in order to continue driving for Respondent; threatened to close the plant rather than deal with a union; and interrogated employees concerning their organizational activities. As it is clear that Respondent's unlawful campaign emanated from the top, so, too, must reassurances that this campaign will end come from the top.
 
 
 51
 242 N.L.R.B. No. 179 at 11 n.14, 101 L.R.R.M. at 1281 n.14. The Board had also found that it was the president who had warned an employee that violence would ensue if the union were voted in, and had previously threatened to fire union supporters.
 
 
 52
 It is unnecessary for us to decide whether the circumstances of the United Dairy Farmers case, or any circumstances whatsoever, could justify the startling innovation of a Board reading order directed at a specified individual. For even the justification the Board attempted in United Dairy Farmers is absent in this case. The Board did not make a careful analysis of the necessity for Harold Anderson to undertake the reading, and the record suggests no such necessity. Of all the unfair labor practices found by the Board, the only one personally performed by Anderson was his promise of benefits as an inducement to avoid the Union. Although this may accurately be categorized as a "fist inside the velvet glove" violation, it was other members of management who carried out firings, made veiled threats to employees, and warned of the consequences of talking with union adherents. Indeed, the Board's opinion does not indicate any unusual need for Harold Anderson to participate personally in the public reading the ALJ had not recommended it, and the Board only stated that the employees "will personally be assured by Respondent's highest ranking representative that those rights will be respected." J.A. 53.
 
 
 53
 It is quite likely that a personal assurance from the chief executive officer of a company will have a marginally greater impact than one coming from some other official of lesser rank. But the negative aspects of the order overwhelm the marginal benefit. Such specificity is uniquely oppressive on the individual singled out, and the lack of particularized need may create the misimpression that the Board is seeking to punish an uncooperative respondent. When the remedial value is as slight as it is in this case, we think that the hardship outweighs the benefit to an extent similar to that condemned in this court's prior decision in International Union of Electrical, Radio & Machine Workers. Giving due regard to personal dignity and the limitations on the Board's discretion, we think such a specific reading order is unjustified. We will enforce this provision of the Board order only if it is modified to require the Employer to "have a responsible officer of Respondent read" the Board notice.[13]
 
 V. Conclusion
 
 54
 The Board has long struggled to accommodate the interests of employers and employees while assuring free choice of bargaining representatives. When one side or the other destroys the balance and creates a climate inimical to an untrammeled selection process, Congress intended the Board to exercise broad discretion in fashioning a remedy. The remedies chosen may or may not be sufficient to the task, but the Board is entitled to try all reasonable measures. The boundaries within which the Board may reasonably exercise its discretion will vary with the severity of the conduct and the needs that conduct creates.
 
 
 55
 We uphold the Board's findings and its decision to withhold a bargaining remedy. We hold that, in the peculiar procedural posture of this case, the Employer is entitled to challenge the Board's remedial choices, but with one exception we uphold those choices as within the bounds of the Board's discretion. On the present record, for the reasons we have explained, we are willing to enforce the public reading requirement, but we conclude that the Board has shown no need for singling out the Employer's president to perform it.
 
 
 56
 It is so ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d)
 
 
 [1]
 Haddon House Food Products, Inc., 242 N.L.R.B. No. 180, 101 L.R.R.M. 1294 (1979). Members Murphy, Truesdale, and Penello formed a majority in refusing to issue a bargaining order; Members Truesdale and Jenkins and Chairman Fanning formed a majority in favor of the order for which enforcement is sought here. Member Murphy opposed some of the union access remedies imposed, while Member Penello criticized the breadth of the remedial order in general terms
 
 
 [2]
 The Board found that the Employer had "sent literally a barrage of letters and telegrams to individual discriminatees and to the employees striking in support." Joint Appendix (hereinafter cited as J.A.) 47. The Employer later informed strikers "that their 'suspensions' were rescinded and directed them to report to work by November 28," or, in some cases, December 1. Id. Some of these letters were received after the deadline had passed, and others were never received
 
 
 [3]
 The Employer does not appeal from the findings that it unlawfully discharged or laid off seven employees, as mentioned above; that an eighth was fired for merely chatting with the picketers; that two employees were subjected to slightly veiled threats of discharge; and that the company president promised a pay increase in order to quell unionism shortly after the first seven firings
 
 
 [4]
 The fourth employee is Albert Romano, compare J.A. 31 with J.A. 805. The ALJ and the Board were willing to exclude arguendo a number of possible unit members, including alleged supervisor Paul Papp and his daughter Paula. This left the ALJ with 59 employees, J.A. 32, corrected by the Board to 56, J.A. 50 n.7
 
 
 [5]
 Masi, it may be noted, was a union adherent, and was considered a unit member by the Union, and challenged by the Employer. It all depends on whose supervisor is being gored
 
 
 [6]
 See, e. g., United Dairy Farmers Cooperative Ass'n v. N.L.R.B., 633 F.2d 1054 at 1065-66 (3d Cir. 1980), and authorities cited
 
 
 [7]
 On review, the Third Circuit, without lengthy discussion of the necessity for a remand, held that the Board did have the power to issue bargaining orders to minority unions "if the employer has committed such 'outrageous' and 'pervasive' unfair labor practices that there is no reasonable possibility that a free and uncoerced election could be held." At 1069. The court reserved judgment on whether the power existed even "when there is no reasonable possibility that the union would have attained an election majority but for the action of the employer," observing that in the present case, "a reasonable possibility exists." Id. n.16. We do not share that court's confidence that the Board's authority is so broad, and we are not persuaded that the Board's decision was predicated wholly on the nonexistence of this legal authority
 
 
 [8]
 When this court, in Textile Workers v. N.L.R.B., 475 F.2d 973 (D.C.Cir.1973), directed the Board to take into account the recidivist history of J.P. Stevens & Co., it was not to punish the employer but to assess the effect on employees of milder remedies in view of a history of obstinate resistance. The case does not support a policy of indulgence toward first offenders
 
 
 [9]
 In addition to Babcock & Wilcox, the Employer cites Central Hardware Co. v. N.L.R.B., 407 U.S. 539, 92 S.Ct. 2238, 33 L.Ed.2d 122 (1972); N.L.R.B. v. Tamiment, Inc., 451 F.2d 794 (3d Cir. 1971); Diamond Shamrock Co. v. N.L.R.B., 443 F.2d 52 (3d Cir. 1971), and Hutzler Bros. v. N.L.R.B., 105 L.R.R.M. 2473 (4th Cir. 1980)
 
 
 [10]
 As the Board in this opinion found it "unnecessary to consider at this time ... what might happen if another union intervenes in an election proceeding involving Respondent and Charging Party," J.A. 52 n.11 (emphasis added), we need not analyze the access portions of the order from the point of view of a hypothetical second union
 
 
 [11]
 We also continue to doubt the propriety of having a Board representative perform the reading. See International Union of Electrical, Radio & Machine Workers v. N.L.R.B., 383 F.2d at 233 n.5
 
 
 [12]
 As in the present case, the remedy was added by the Board sua sponte after it rejected the ALJ's recommendation of a bargaining order. The remedies were not challenged before the Board, and so the court would not permit the employer to attack them on review. The "exceptional circumstances" issue was not discussed, and the court did not specify the order of filing. United Dairy Farmers Cooperative Ass'n v. N.L.R.B., 633 F.2d 1054 at 1064 (3d Cir. 1980)
 
 
 [13]
 The Board order also requires Harold Anderson to sign the notice personally. That provision raises entirely different issues, and has not been challenged by the Employer. It will be enforced without modification