**Theodore POLYDOROFF and Timothy C. Miller, Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.**

No. 84–1183.

United States Court of Appeals, District of Columbia Circuit.

Argued March 28, 1985.

Decided Sept. 24, 1985.

---

Joseph G. Dail, Jr., McLean Va., for petitioners.

Dennis J. Starks, Atty., I.C.C., Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Dept. of Justice, Robert S. Burk, Acting Gen. Counsel, Lawrence H. Richmond, Deputy Associate Gen. Counsel, I.C.C., Catherine O'Sullivan and Andrea Limmer, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents. John Broadley and Kathleen V. Gunning, Attys., I.C.C. and Barry Grossman, Atty., Dept. of Justice, Washington, D.C., also entered appearances for respondents.

Before TAMM *, MIKVA and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

Petitioners, two trucking company attorneys, seek review of and relief from disciplinary sanctions imposed on them by the Interstate Commerce Commission (ICC or Commission). The ICC suspended them from practicing before the Commission for six months. We affirm the Commission.

*The Facts*

Theodore Polydoroff is a long-time practitioner before the ICC. In 1971 Polydoroff began to represent Gardner Trucking (GT or Gardner), securing on GT's behalf motor contract carrier authority to transport for Chemetron Corporation. Polydoroff obtained additions and modifications to this authority over the years. In 1975, Polydoroff started to represent Gardner's then-partner, Julian Martin, Inc. (JMI or Martin) in noncompetitive authority applications before the ICC. Gardner and Martin subsequently ended their partnership acrimoniously. At this point Martin asked Polydoroff to represent JMI in seeking authority before the ICC that would in fact enable him to compete with Gardner in

shipping Chemetron goods. Recognizing that Gardner would object to such dual and conflicting representation, and not wanting to lose Gardner as a client, Polydoroff turned the Martin matter over to a free-lance lawyer of his acquaintance, co-petitioner Timothy Miller. Although Miller filed Martin's various petitions, there is no dispute that they were produced under Polydoroff's control, and Polydoroff received compensation for them. In one of his applications filed in 1979, Martin alleged service deficiencies by Gardner as a basis for seeking competing authority.

All of Polydoroff's involvement in the Martin applications occurred without Gardner's knowledge. Indeed, on three separate occasions, Gardner asked Polydoroff to file protests of Martin's competing activities with the ICC. Polydoroff refused each of these requests. Finally, in June of 1979, Gardner discovered Miller working in Polydoroff's office and learned of his attorney's involvement with his arch-rival Martin. Gardner promptly found new attorneys.

Among the early activities of Gardner's new lawyers was a lawsuit in Maryland district court against Polydoroff for $138 million in damages. This case was dismissed in 1984. In addition, a complaint seeking sanctions against Polydoroff was filed with the Virginia state bar authorities. The Virginia proceedings were dismissed on the ground that the evidence available could not support any allegation of misconduct under a "clear and convincing" evidentiary standard. The instant ICC proceedings, after a preliminary investigation, resulted in seven days of hearings before an administrative law judge (ALJ). On July 14, 1983, the ALJ ruled in favor of Polydoroff, holding that since there had been no retainer agreement with Gardner, Polydoroff was free to represent Martin simultaneously and not under any duty to disclose the dual representation to Gardner. Gardner appealed the ALJ's decision to the full Commission, and on April 23, 1984, the

---

* Judge Tamm had fully concurred in this opinion prior to his death.

Commission reversed the ALJ and issued its decision suspending and reprimanding Polydoroff. It is that decision which petitioners appeal, and which we uphold.

### The Standards for Attorney Conduct

There can be little doubt that the Commission, like any other institution in which lawyers or other professionals participate, has authority to police the behavior of practitioners appearing before it. Petitioners challenge the Commission's jurisdiction to discipline attorneys, arguing that an amendment to the Administrative Procedure Act, Pub.L. 89–332, 79 Stat. 1281 (1965), codified at 5 U.S.C. § 500 (1982), deprived agencies of this authority. The statute, however, merely prohibits agencies from erecting their own supplemental admission requirements for duly admitted members of a state bar: "An individual who is a member in good standing of the bar of the highest court of a State may represent a person before an agency ..." § 500(b). The very next subsection of the statute compels our conclusion that the agency retains the power to discipline the attorneys who practice before it. Section 500(d)(2) provides that § 500(b) "does not authorize or limit the discipline, including disbarment, of individuals who appear in a representative capacity before an agency." As if these plain words were not enough to brand petitioners' challenge as frivolous, the meaning of the statute has already been well-settled by judicial interpretation. *See Touche Ross & Co. v. SEC,* 609 F.2d 570, 578 n. 13 (2d Cir.1979) (Congress did not limit inherent power of agencies to discipline professionals who appear or practice before them). Drawing on this well-recognized authority, the Commission has adopted Canon 9:

*Adverse influences and conflicting interests.* It is a duty of a practitioner at the time of retainer to disclose to the client all the circumstances of his relations to the parties, and any interest in or connection with the controversy, which might influence the client in the selection of the person to represent or assist him.

It is unethical to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts. Within the meaning of this canon a practitioner represents conflicting interests when in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose.

The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed.

It strains the imagination to see where petitioners can run to hide from the plain meaning of this canon. Put aside the ALJ's erroneous holding that the absence of a retainer agreement justified Polydoroff's conduct; put aside the disputed facts as to Polydoroff's role in various meetings with Chemetron Corporation. Put simply, Polydoroff received compensation from both Gardner and Martin, and the interests of his two clients conflicted with each other. Petitioners offer a fatuous distinction between "competing interests" and "conflicting interests." It is a silly distinction.

Nor can petitioners take any comfort from the Model Code of Professional Responsibility adopted by the American Bar Association. Under both that Code and its successor, the Model Rules of Professional Conduct adopted by the ABA in 1983, the conduct of petitioners is proscribed. Rule 1.7 of the Model Rules states:

RULE 1.7 Conflict of Interest: General Rule (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

This rule could have been written with this case in mind; it describes petitioners' wrongdoing precisely.

Petitioners offer numerous procedural challenges, none of them weighty enough to interfere with the Commission's judgment. Their claim that Gardner was not a proper party to appeal from the ALJ's decision fails on two grounds. The Commission's regulations clearly make Gardner a party, even though he was dubbed an "intervener" early in the proceedings. *See* 49 C.F.R. § 1101.2(d) (1984). In any event the controlling statute, 49 U.S.C. § 10322(g)(1) (1982), specifically authorizes the Commission to reopen a proceeding or change one of its actions "on its own initiative." The meaning is plain.

Petitioners' various complaints of "prosecutorial abuse" fall far short of the showing necessary to lift the Commission's judgment in this case. The final contention by petitioners is that in any event the sanction was too severe. We think not. More importantly, the Commission judged the sanction to be proper and we find this exercise of discretion to be sound.

## CONCLUSION

Whether agency or court, any institution engaging in the adjudicative process must have the power to police the professionals who practice before it. There is no more important area for such policing than guaranteeing that the professional advocates give their causes "warm zeal" unfettered by conflicting loyalties or interests. When the lawyer deviates from professional standards as blatantly as in the case sub judice, the penalty must be consonant with the transgression against the integrity of the institution. We find the Commission's decision to reprimand and suspend well within its discretion and we dismiss the petition for review.

*It is so ordered.*