# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 9, 2016                    Decided May 20, 2016

No. 14-1222

HTH CORPORATION, ET AL.,
PETITIONERS

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 14-1283

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Richard M. Rand* argued the cause and filed the briefs for petitioners. *Peter J. Petesch* and *Megumi Sakae* entered appearances.

*Barbara A. Sheehy*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Richard F. Griffin, Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Usha Dheenan*, Supervisory Attorney.

Before: HENDERSON and ROGERS, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

Opinion concurring in part and concurring in the judgment filed by *Circuit Judge* HENDERSON.

Opinion concurring in part and concurring in the judgment filed by *Circuit Judge* ROGERS.

WILLIAMS, *Senior Circuit Judge*: The National Labor Relations Board determined that petitioners HTH Corporation and various affiliates (collectively "HTH" or the "company") committed a host of severe and pervasive unfair labor practices, a finding that HTH does not here dispute. HTH does, however, petition for review of five extraordinary remedies imposed by the Board, three of them adopted by the Board *sua sponte* and two of them recommended by the administrative law judge but then modified by the Board. The company petitions for review of these new and modified remedies and the Board cross-applies for enforcement of its Order. Because the company failed to file a motion for reconsideration with the Board, we lack jurisdiction to consider the company's objections to all but two of the challenged remedies. As to those two, we uphold one (notice-reading) and vacate the other (attorney's fees).

3

* * *

The company, which operates the Pacific Beach Hotel in Honolulu, is no stranger to the Board or to the judicial system. Time and time again, the Board and the courts have concluded that the company violated the law in its dealings with the International Longshore and Warehouse Union, Local 142. A brief overview of the prior violations will provide context for the imposition of extraordinary remedies in this case.

Starting as early as 2002, the company unlawfully interfered with a representation election, *HTH Corp.*, 342 N.L.R.B. 372, 374 (2004), and then with an election held to replace that election, *Pacific Beach Corp.*, 344 N.L.R.B. 1160, 1163 (2005). The union prevailed in the latter and was duly certified. There followed various efforts to derail the union and two sets of unfair labor practice charges. The first set led to a Board order, *HTH Corp.*, 356 N.L.R.B. 1397 (2011), *enforced*, 693 F.3d 1051 (9th Cir. 2012), and to a court injunction under § 10(j) of the National Labor Relations Act, *Norelli v. HTH Corp.*, 699 F. Supp. 2d 1176 (D. Haw. 2010), *aff'd sub nom. Frankl v. HTH Corp.*, 650 F.3d 1334 (9th Cir. 2011). The company violated that injunction, leading to compensatory contempt citations against it and its Regional Vice President, Robert Minicola. *Frankl v. HTH Corp.*, 832 F. Supp. 2d 1179 (D. Haw. 2011).

The second set of charges ultimately resulted in the extraordinary remedies contested here. In September 2011 an administrative law judge determined that the company had violated the Act by disciplining and firing a union activist named Rhandy Villanueva (who had been unlawfully fired once before), unilaterally increasing housekeepers' workloads, unreasonably withholding information from the union, surveilling union activities, banning two union representatives from the hotel and then announcing the ban to employees,

threatening to remove a union agent who was distributing union literature from a public sidewalk, and halting its matching contributions to employees' 401(k) plans. *HTH Corp.*, 2011 WL 4073681 (Sept. 13, 2011). Several of these actions, including Villanueva's second termination, were in violation of the § 10(j) injunction and formed the basis of the district court's later imposition of contempt sanctions. See *Frankl*, 832 F. Supp. 2d at 1187-1203, 1206-13, 1216-17. The ALJ recommended a set of remedies, only two of which are relevant for our purposes: requirements of (1) notice-posting and (2) notice-reading.

The ALJ's proposed notice-reading remedy required either the company's CEO and its President, or Minicola (the Regional Vice President), to read to employees a "notice" drafted by the Board. In the "notice" the officials are to say that "we" have violated the National Labor Relations Act and the employees' rights and to state 15 specific assurances in the form, "We will" adhere to specified NLRA obligations and remedy various breaches, or "We will not" violate the Act in a wide range of specified ways.

The company filed various exceptions to the ALJ's decision. Only one is relevant here—an objection to the notice-reading remedy on the ground that extraordinary remedies were unwarranted because there had been no showing that traditional remedies were insufficient to cure the company's unfair labor practices. The company didn't object to the ALJ's notice-posting remedy.

In October 2014 the Board issued the Order on appeal here. *HTH Corp.*, 361 N.L.R.B. No. 65, 2014 WL 5426174 (Oct. 24, 2014). The Board agreed with the ALJ that the company had committed each of the alleged violations but found the ALJ's recommended remedies insufficient. Accordingly, it *sua sponte* ramped up the notice-posting and

notice-reading requirements and imposed three additional extraordinary remedies.

We need not detail the Board's expansions of the notice-posting requirement as (for reasons soon to be developed) the company's objections to them are barred by § 10(e) of the Act. As to the notice-reading remedy, the Board decreased the burden in one respect and increased it in others. It mitigated the order by allowing the company to have a Board agent read the notice rather than requiring that Minicola or the CEO and President do so. It toughened the remedy by (1) removing the option of having the CEO and President read the notice (i.e., if a company manager is going to fulfill this obligation, it must be Minicola); (2) requiring that an Explanation of Rights be read at the notice-reading event; (3) requiring that all company supervisors and managers attend the reading; and (4) specifying that a union representative be allowed to be present.

The new Board remedies, not rooted in the ALJ's report, consisted of (1) awarding litigation expenses to the General Counsel and the union; (2) awarding bargaining and other expenses to the union; and (3) subjecting the company for three years to Board "visitation" throughout company premises and files to assess compliance with the Board's more conventional orders. The Board tripled the length of the "notice" to be read aloud by including, among other things, assurances that "We will" implement each of the Board's remedial requirements. (The company points to a fourth new remedy—requiring publication of the notice and the Explanation of Rights in two local publications—but we think the publication requirement is classified more appropriately as an expansion of the notice-posting remedy. The classification has no effect on the preclusion of the company's challenge, as it failed to object on this score to the ALJ's order or to seek reconsideration of the Board's.)

Two members of the Board, Members Miscimarra and Johnson, dissented.

The company didn't file a motion for reconsideration with the Board, opting instead to go directly to this court. On appeal the company challenges only the three new remedies added by the Board and the expansions of the ALJ's notice-posting and notice-reading remedies.

* * *

We lack jurisdiction to consider most of the company's objections because they were never raised before the Board. Section 10(e) of the Act provides that "[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). See also *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665-66 (1982) (the § 10(e) bar is jurisdictional). The company's failure to file a motion for reconsideration bars all its challenges except, for reasons we'll explain, its objections to the Board's award of litigation expenses and aspects of its challenge to the notice-reading remedy.

The company raises several arguments in an attempt to salvage its barred claims. First, the company argues that the dissents by Members Miscimarra and Johnson offered the Board an opportunity to confront objections to its Order, and that the majority's rejection of the dissenters' points suggests that moving for reconsideration would have been futile. But a party may not rely on arguments raised in a dissent or on a discussion of the relevant issues by the majority to overcome the § 10(e) bar; the Act requires the party to raise its challenges itself. See *Contractors' Labor Pool, Inc. v. NLRB*, 323 F.3d 1051, 1061 (D.C. Cir. 2003); *Local 900, Int'l Union*

*of Elec., Radio and Mach. Workers v. NLRB*, 727 F.2d 1184, 1191-92 (D.C. Cir. 1984).

Next, the company argues that the challenged remedies are patently *ultra vires* and meet § 10(e)'s "extraordinary circumstances" exception. The company is right that we could review a remedy that is patently *ultra vires*. *Alwin Mfg. Co. v. NLRB*, 192 F.3d 133, 143 n.13 (D.C. Cir. 1999). But the Board's remedial authority is broad, see, e.g., *United Food & Commercial Workers Union Local 204 v. NLRB*, 447 F.3d 821, 827 (D.C. Cir. 2006), and that authority was not patently exceeded under our precedents, particularly considering the company's history of severe and pervasive unfair labor practices. Nor does the mere fact that the Board acted *sua sponte* constitute an "extraordinary circumstance"; the company was required to file a motion for reconsideration to preserve its challenges. See *NLRB v. FLRA*, 2 F.3d 1190, 1195 (D.C. Cir. 1993).

Finally, the company argues that its exceptions to the ALJ's decision sufficed to preserve its challenges even to remedies or requirements that the Board imposed *sua sponte*. But an exception, no matter how broadly formulated, cannot preserve an objection to something that the ALJ never imposed. See *NLRB v. Sambo's Rest., Inc.*, 641 F.2d 794, 796 (9th Cir. 1981); *NLRB v. St. Regis Paper Co.*, 674 F.2d 104, 108 n.4 (1st Cir. 1982). Cf. *Quazite Div. of Morrison Molded Fiberglass Co. v. NLRB*, 87 F.3d 493, 497 (D.C. Cir. 1996) ("A categorical denial does not place the Board on notice that its particular choice of remedy is under attack[.]").

The company did, however, argue before the Board that the notice-reading remedy was extraordinary and that extraordinary remedies were unwarranted because there had been no showing that traditional remedies were insufficient to address the unfair labor practices. Although the objection did

not specify the attributes of the notice-reading remedy that called for special judicial concern (see below), we have held that "when the issues implicated by an imprecisely drafted objection are made evident by the context in which it is raised," § 10(e) is not a bar. *Consol. Freightways v. NLRB*, 669 F.2d 790, 794 (D.C. Cir. 1981). Indeed, the Board does not dispute that the notice-reading remedy is properly before us.

Here, of course, the Board changed the remedy in various ways, most importantly by giving the company the option of having a Board agent read the notice. But the Board does not deny that even after its changes, the remedy remained "extraordinary" and thus subject to the objection that it's unwarranted so long as traditional remedies suffice. See *In Re Federated Logistics & Operations*, 340 N.L.R.B. 255, 256 (2003) (acknowledging that notice-reading with the Board-agent option is an extraordinary remedy); *First Legal Support Servs., LLC*, 342 N.L.R.B. 350, 350 n.6 (2004) (explaining that extraordinary remedies cannot be granted unless traditional remedies are insufficient). Although the option to have a Board employee read the notice alters matters, as we shall see when we address the merits, the order as modified poses objections similar in character to those posed by the ALJ recommendation. The Board's *additions*, however, seem distinctive, and insofar as they may call for anything more than generalized analysis of the adequacy of traditional remedies, HTH should have sought reconsideration if it wished to challenge them in court.

In Judge Henderson's view, "we are without jurisdiction to consider the validity *vel non* of the Board-agent option." Henderson Op. 3. Assuming that to be true, the company's general challenge to the notice-reading remedy as an extraordinary remedy is *not* barred, and it would make little sense to consider that challenge without regard to the Board's

amelioration of the remedy (from HTH's viewpoint) by giving HTH another option. Taken to its extreme, such hyper-refinement of party obligations under § 10(e) would mean that any change made by the Board *sua sponte*, however trivial, would require a motion for reconsideration (or else require the reviewing court to ignore the change). We decline to adopt this approach.

One other issue is also open to review—the Board's award of litigation expenses. We have explained that filing a motion for reconsideration is patently futile where the agency had previously rejected the very argument made by petitioner. *FLRA*, 2 F.3d at 1196; cf. *W & M Properties, Inc. v. NLRB*, 514 F.3d 1341, 1346 (D.C. Cir. 2008). The patent futility of a reconsideration motion excuses the failure to object, at least where the Board acts *sua sponte*. See *FLRA*, 2 F.3d at 1196. Here, the Board rejected the company's argument with respect to litigation expenses—that the Board has no inherent authority to award such expenses—three years before its decision in this case. See *Camelot Terrace*, 357 N.L.R.B. 1934, 1937-39 (2011). The Board had also awarded litigation expenses based in part on its asserted inherent authority in earlier cases. See, e.g., *Teamsters Local Union No. 122*, 334 N.L.R.B. 1190, 1193 (2001); *Alwin Mfg. Co.*, 326 N.L.R.B. 646, 647 & n.6 (1998), *enforced*, 192 F.3d 133 (D.C. Cir. 1999); *Lake Holiday Manor*, 325 N.L.R.B. 469, 469 & n.5 (1998). In light of this precedent, asking the Board to reconsider its *sua sponte* decision to award litigation expenses in this case would have been patently futile—and the failure to do so is excused under § 10(e)'s "extraordinary circumstances" exception. See *FLRA*, 2 F.3d at 1196.

The cases generally do not distinguish between attorney's fees and other litigation costs for purposes of applying the American rule. See, e.g., *Nepera Chem., Inc. v. Sea-Land Serv., Inc.*, 794 F.2d 688, 696 n.56 (D.C. Cir. 1986) ("The

reasons underlying the American Rule lead to the conclusion normally that litigation expenses other than attorneys' fees are similarly nonrecoverable."). See also *Fox v. Vice*, 131 S. Ct. 2205, 2213 (2011) ("Our legal system generally requires each party to bear his own *litigation expenses, including attorney's fees*, regardless whether he wins or loses." (emphasis added)); *Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 502 F.2d 349, 356 n.22 (D.C. Cir. 1974) ("The American rule generally disfavors the award of attorney fees *and other litigation expenses* except where specifically provided for by statute or contract." (emphasis added)). Thus, as the parties have generally done in this case, we treat them as a package.

\* \* \*

We turn now to the merits of the company's two preserved challenges—the mandated notice-reading first. Recall that the ALJ recommended an order requiring specified high-level company officials to read out the notice acknowledging the company's violations and committing not to indulge in such behavior in the future. The Board, apart from adding elements that § 10(e) bars us from considering, narrowed the choice of persons to one, Minicola, but then broadened the company's choices by giving it the option of having a Board employee read the notice in the presence of company management.

The history of our court's consideration of this issue is long and complex, but displays two patterns: first, succeeding panels manifest no detectable obligation to heed prior panels; second, the degree of deference to the Board steadily increases. We will recite the three key cases in chronological order.

The line starts with *International Union of Electrical, Radio & Machine Workers v. NLRB*, 383 F.2d 230 (D.C. Cir.

1967) ("*IUE*"), in which the Board ordered "the employer" (it singled out no individual) to read a notice to "groups of employees, convened during working hours." *Id*. at 232. This was on top of requirements that the employer mail the notice to each employee, post copies of the notice, and give a union access to the facilities to present the union position (on company time and at company expense). *Id*. & n.4. After the usual genuflection to Board discretion, we dispatched the idea in two sentences:

> The public reading by the employer of the order would, further, be humiliating and degrading to the employer and undoubtedly would have a lingering effect on future relations between the company and the Union. It could as well have an impact on the atmosphere, not only at the time of the reading, but in the future, for peaceful, fruitful, and effective labor bargaining.

*Id*. at 233 (footnote omitted). We then opened the door the tiniest sliver to a possible exception, and even in doing that we returned immediately to the basic proposition that such an order had no place in our democratic system:

> It is conceivable that some conduct on the part of an employer or a union might reach such extreme dimensions as to justify the novel and drastic step of requiring the offending party to stand up before the employees and read the Board's notice publicly, but we cannot close our eyes to the reality that such a course would inevitably poison the future relations between company and union and be a source of continuing resentment. The ignominy of a forced public reading and a "confession of sins" by any employer, any employee, or any union representative makes such a remedy incompatible with the democratic principles of the dignity of man.

*Id*. at 233-34. Although the opinion suggests that it is "conceivable" that some conduct would call for a mandatory reading remedy, the passage reverts to the court's basic take on the issue—that such a mandate is "incompatible with the democratic principles of the dignity of man."

The next time we considered the matter, in *Teamsters Local 115 v. NLRB*, 640 F.2d 392 (D.C. Cir. 1981), the court gave *IUE* a nodding glance, and then went on to give great weight to a "new" purpose advanced by the Board—the desirability of a management reading to provide employees "reassurances that this [unlawful] campaign will end." *Id*. at 402 (citation and internal quotation marks omitted). What made this purpose so "new" the court did not reveal. The court then paraphrased *IUE*'s allusion to the conceivability of circumstances where, as the court put it, "the need for the remedy would outweigh its oppressiveness," and without more ado approved mandatory employer reading. *Id*. at 403. Thus, what *IUE* had unequivocally condemned, subject to a "conceivable" exception, became something that with a little "balancing" would be quite all right.

The court did, however, gag on one aspect of the order— the specification of a named individual, the president and owner of the offending firm. As he had directly performed only one of the unfair labor practices, singling him out went too far. *Id*. at 403-04.

In the next case, *Conair Corp. v. NLRB*, 721 F.2d 1355 (D.C. Cir. 1983), the court did not even pause to consider the propriety of a notice-reading mandate, and jumped directly to the specification of a named perpetrator. See *id*. at 1385-86. Thus what *IUE* had said was "incompatible with the democratic principles of the dignity of man" was now acceptable automatically. The court did make a footnote allusion to *IUE*, scoffing at the dissent's reliance on it:

> The dissent reaches back to our decision in [*IUE*] for language characterizing the requirement of a public reading as "incompatible with the democratic principles of the dignity of man."

*Id*. at 1386 n.99. (The "reach back" was a full 16 years, less than half the time that elapsed from *Conair* to the present.) It then went on to say that *IUE* had been "superseded, if not actually overruled, by our more recent decision" in *Teamsters Local 115*, *id*., without explaining what entitled one panel to overrule or "supersede" a prior panel's decision. Normally such switches can be done only by the court *en banc* or by an *Irons* footnote (reflecting unanimous court approval). See *LaShawn v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (*en banc*).

The *Conair* court went on to approve what *IUE* had not even dreamed of and what *Teamsters Local 115* had been unable to stomach: a mandate that a particular perpetrator read out the language specified by the Board. The court recognized that such public reading implicated dignity interests but held that the order was justified by the president's "pervasive personal involvement" in his company's unfair labor practices. *Conair*, 721 F.2d at 1386.

The dissent that the *Conair* majority dismissed in a footnote was by then-Judge Ruth B. Ginsburg. Then-Judge Ginsburg objected to requiring Conair's president to personally read out the notice, even though the president's personal involvement in the company's unfair labor practices was "far more conspicuous" than in *Teamsters Local 115*. *Conair*, 721 F.2d at 1401 (Ginsburg, J., dissenting). The dissent merits quoting at length:

> I would modify the extraordinary notice remedies in one respect. The Board's order requires that Conair's

president, Leandro Rizzuto, personally read the Board's cease and desist notice to an assembly of employees; I would allow Rizzuto to choose between reading the notice himself or designating a responsible officer to read it on his behalf.

. . .

[A] reading order "directed at a specified individual" is a "startling innovation." [*Teamsters Local 115*, 640 F.2d at 403.] Such an order would occasion no surprise in a system in which those who offend against state regulation must confess and repent as a means of self-correction, or to educate others. But it is foreign to our system to force named individuals to speak prescribed words to attain rehabilitation or to enlighten an assembled audience. The Board, I believe, has not thoughtfully considered this point.

A forced, public "confession of sins," even by an owner-president who has acted outrageously, is a humiliation this court once termed "incompatible with the democratic principles of the dignity of man." [*IUE*], 383 F.2d at 234. It has a punitive, vindictive quality, *see Teamsters Local 115*, 640 F.2d at 401, and is the kind of personal performance command equity decrees have avoided. Moreover, as Board Chairman Van de Water noted, *Conair*, 261 NLRB at 1195 n. 28, a reading of the notice by the president may be less effective than a reading by another responsible officer. The former, humiliated and degraded by the personal specific performance order, may demonstrate "by inflections and facial expressions, his disagreement with the terms of the notice." *Id.* The latter, assigned the task but lacking the same personal involvement, may perform it with less distaste, more detachment, and thus with greater

credibility.  I would not single out the president here, or any other named individual, hand him lines, and make him sing.

*Conair*, 721 F.2d at 1401-02 (Ginsburg, J., dissenting) (some citations omitted).

It's worth pausing to think briefly why so many of our distinguished predecessors have used the terms "humiliating and degrading," "ignominy," and "confession of sins" for a mandatory reading—especially by a named perpetrator—not to mention why then-Judge Ginsburg acknowledged that an order of this sort "would occasion no surprise in a system in which those who offend against state regulation must confess and repent as a means of self-correction, or to educate others." *Id*. at 1401.  For those familiar with 20th century history, such an order conjures up the system of "criticism-self-criticism" devised by Stalin and adopted by Mao.  "Criticism" generally took the form of an attack on the target by his or her peers at a meeting with fellow workers, spouting claims fed them by powerful members of the Communist party (on pain of themselves being tagged enemies of the people), and then regurgitated by the target ("self-criticism") in the hopes that full confession might avert dispatch to the gulag, torture or execution.

What is the subtext communicated by the sort of scene the Board would mandate?  What is communicated to the assembled workers and the perpetrator himself?  "You see before you one of your managers, who normally has a responsibility to make important choices as to your work.  But who is he?  Not merely is he a lawbreaker, but he is a pathetic creature who can, at the behest of federal officials (and not especially lofty ones at that), be forced to spout lines they have put in his mouth.  He is not even a parrot, who can choose when to speak; he is a puppet who speaks on command words

that he may well abominate.  We have successfully turned him into a pathetic semblance of a human being."  Of course, one may say, here it is just that the mighty have fallen; he was a lawbreaker.  But fallen *so low*?  Fallen to a condition that denies his autonomy?  Cf. *United States v. Gementera*, 379 F.3d 596, 611 (9th Cir. 2004) (Hawkins, J., dissenting) (saying that the sole purpose of a sentence requiring a convicted mail thief to stand outside a post office for eight hours wearing a sandwich board stating, "I stole mail.  This is my punishment" was "to turn him into a modern day Hester Prynne").

As the quoted passage shows, then-Judge Ginsburg approved the idea of an order allowing the company to avoid the confessional feature by designating an officer to read out a notice acknowledging the company's violations.  The difference seems as obvious to us as it was to the court in *Teamsters Local 115*.

Here of course the Board gave the company another option—that of a having a Board agent read the notice to the employees in the presence of management.  This measure, too, has a history in our court.  In *IUE* we condemned it harshly in dictum: "This procedure . . . creates a problem more severe than the one it supposedly solves" because its "practical effect" "is to put the imprimatur of the Board on both a particular union's activities, as well as on union activities in general."  383 F.2d at 233 n.5.  See also *Teamsters Local 115*, 640 F.2d at 402 n.11 ("We . . . continue to doubt the propriety of having a Board representative perform the reading." (citing *IUE*)).  Recently, however, we enforced a notice-reading order with the Board-agent option, without even a nod to *IUE* (which neither party had cited).  *Federated Logistics & Operations v. NLRB*, 400 F.3d 920, 929-30 (D.C. Cir. 2005).  Although the court gave no explanation for the switch, we believe that the "imprimatur" concern appears weak.  After all, the *substance* of the notice will make employees fully aware

of how the Board has ruled, of which "side" the Board has taken.

Indeed, in *NLRB v. S.E. Nichols, Inc.*, 862 F.2d 952 (2d Cir. 1988), when the Second Circuit found itself confronted with an order that the president of an offending retail chain read a notice, the court (*sua sponte* so far as appears) limited the order to the store where the violations had taken place and required the Board to give the company the alternative, at its option, of having the notice read by a Board representative. *Id*. at 962. "This alternative eliminates the necessity of participation by the company, if it so desires, and still guarantees effective communication of the Board's order to the company's employees." *Id*. See also *Textile Workers Union v. NLRB*, 388 F.2d 896, 904 (2d Cir. 1967) (rejecting the imprimatur idea). Accordingly, we feel no obligation to follow the court's previous dicta.

Given the company's long history of unlawful practices and the severe violations the Board found in this case, we uphold the Board's exercise of discretion in ordering notice-reading in the modified form, i.e., with the company having the option of punting the task to a Board employee. (As explained above, we lack jurisdiction to consider the company's challenges to the additional requirements the Board appended to the notice-reading remedy. We therefore enforce those requirements.) Further, given the option of having the notice read by a Board employee, we have no need to address the validity of an employee-specific notice-reading mandate unaccompanied by such an option.

* * *

We turn next to the Board's award of litigation expenses to the General Counsel and the union. In *Unbelievable, Inc. v. NLRB*, 118 F.3d 795, 800-06 (D.C. Cir. 1997), we held that

the Board lacks authority to shift litigation expenses under § 10(c) of the Act, which empowers the Board "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of [the Act]," 29 U.S.C. § 160(c). In ordering fees in this case, the Board recognized the holding in *Unbelievable* but claimed that, like a federal court, it has "inherent authority to control and maintain the integrity of its own proceedings through an application of the bad-faith exception to the American Rule." *HTH Corp.*, 361 N.L.R.B. No. 65, Amended Deferred Appendix ("App.") 3-4. See *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991) (recognizing that although the American rule prohibits fee shifting in most cases, federal courts have inherent power to assess attorney's fees "when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons'" (citation and internal quotation marks omitted)).

As a creature of statute the Board has only those powers conferred upon it by Congress. See *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001). To be sure, we have recognized that agencies enjoy some powers that were not *expressly* enumerated by Congress. See, e.g., *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (power to reconsider prior decisions); *Polydoroff v. ICC*, 773 F.2d 372, 374 (D.C. Cir. 1985) (power to police the behavior of practitioners); *Howard Sober, Inc. v. ICC*, 628 F.2d 36, 41 (D.C. Cir. 1980) (power to correct clerical mistakes). Although we have often described these powers as "inherent," the more accurate label is "statutorily implicit." See *Ivy Sports*, 767 F.3d at 93 (Pillard, J., dissenting). Therefore, unlike a federal court, the Board may apply the bad-faith exception to the American rule only if some provision or provisions of the Act explicitly or implicitly grant it power to do so.

19

In deciding to award litigation expenses on a bad-faith theory, the Board relied solely on its "inherent authority to control and maintain the integrity of its own proceedings." *HTH Corp.*, 361 N.L.R.B. No. 65, App. 3-4. Neither in its Order nor on appeal has the Board argued that the power to shift fees in cases of bad faith is implicit in the Act. Given that it is wrong to speak of agencies as having *any* inherent authority, it would under many circumstances be quite appropriate for us to say that the Board has cited no pertinent authority at all, to vacate this part of the Order under review, and to have done with it.

There are several reasons to reject that approach and consider whether § 10(c) implicitly authorizes fee shifting based on bad faith. First, the distinction between inherent authority and implicitly granted authority is a subtle one—so subtle that this court generally overlooked it until Judge Pillard pointed it out in *Ivy Sports*. Second, considering § 10(c) does not take us into refined linguistic nuances; § 10(c) simply authorizes the Board to take "such affirmative action . . . as will effectuate the policies" of the Act. Third, and closely related to the purely linguistic point, the decisive considerations resolving the issue stem not from the exact language of § 10(c) but from contextual concerns that were at the heart of *Unbelievable* and the subject of intense discussion at oral argument.

The controlling contextual concern arises from two propositions: first, that nothing in § 10(c) grants the Board punitive powers, and, second, that application of the American rule's bad-faith exception is punitive. On the first, as we said in *Unbelievable*, "The Supreme Court has consistently invalidated Board orders that are not directly related to the effectuation of the purposes of the Act *or* are punitive." 118 F.3d at 805 (emphasis added). We cited several decisions in support of that proposition, starting with *Consolidated Edison*

*Co. v. NLRB*, 305 U.S. 197, 235-36 (1938), which held that the Board's purported cancellation of bargaining agreements that were not causally derived from the alleged unfair labor practices was punitive and therefore not within the Board's § 10(c) powers, even if the Board should "be of the opinion that the policies of the Act might be effectuated by such an order." *Id*. at 236. Similarly, once we found in *Capital Cleaning Contractors, Inc. v. NLRB*, 147 F.3d 999, 1009-12 (D.C. Cir. 1998), that the Board's imposition of contract terms on a successor employer based on terms negotiated by its predecessor was punitive in the circumstances, we held it beyond the Board's powers. A § 10(c) remedy, we said, "must be truly remedial and not punitive." *Id*. at 1009.

This authoritative ban on punitive remedies by the Board is triggered here: the Supreme Court has consistently classified application of the bad-faith exception to the American rule as punitive. *Hall v. Cole*, 412 U.S. 1, 5 (1973). Such fee shifting is akin to a fine for civil contempt: both serve the purpose of vindicating the tribunal's authority over a recalcitrant litigant. *Chambers*, 501 U.S. at 53.

The Board doesn't dispute that it may not adopt punitive remedies but argues instead that its award of litigation expenses is "clearly compensatory in nature." *HTH Corp.*, 361 N.L.R.B. No. 65, App. 4. According to the Board, the General Counsel and the union were forced to squander resources on this case, and the fee award merely "helps restore the parties to where they would have been but for the [company's] unlawful conduct." *Id*. Of course we recognize that compensation and punishment are not inherently mutually exclusive goals. But in the context of the American rule, any attempt to rest on the compensatory character of a fee award runs into the basic underpinning of the American rule, namely, the idea that the compensatory functions of fee shifting collide, in the litigation context, with other values, particularly

broad freedom to assert rights and defenses. See *Summit Valley Indus. Inc. v. Local 112*, 456 U.S. 717, 724-25 (1982). Thus we said in *Unbelievable*, "To the extent that the Board is relying upon the idea that a party is not made whole unless it recovers its attorney's fees, . . . that is but a criticism of the American Rule—indeed, a criticism that the Supreme Court has heard and rejected." 118 F.3d at 805. As the Supreme Court declared in *Chambers*, "That the award ha[s] a compensatory effect does not in any event distinguish it from a fine for civil contempt, which also compensates a private party for the consequences of a contemnor's disobedience." 501 U.S. at 53-54 (citation and internal quotation marks omitted). See also *id*. at 54 n.15.

The Board's opinion also says that the fee award "protects the integrity of our processes, serving as a deterrent to violations" of its Order and protecting the parties' rights (presumably by way of deterring further unfair labor practices). *HTH Corp.*, 361 N.L.R.B. No. 65, App. 4. But in the context of identifying the powers granted the Board, the Court has rejected deterrent purposes precisely on the ground of their overlap with punitive goals. When the Board tried to order an employer to compensate government relief agencies whose expenditures had been increased as a result of the employer's violations, the Court firmly rejected the Board's reliance on deterrent effect. If "a deterrent effect is sufficient to sustain an order of the Board, it would be free to set up any system of penalties which it would deem adequate to that end." *Republic Steel Corp. v. NLRB*, 311 U.S. 7, 12 (1940).

Because the Board has (at best) invoked only § 10(c), we do not decide whether the power to shift fees in cases of bad faith may be implicit in some other provision of the Act.

22

* * *

With respect to the award of litigation expenses, we grant the company's petition and deny enforcement.  As to all other portions of the Order, we deny the petition and enforce the Order, either on the merits or because of HTH's failure to meet the requirements of § 10(e).

*So ordered.*

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring in part and concurring in the judgment: I agree with my colleagues that we should uphold the Board's notice-reading remedy and strike its award of litigation expenses. We differ, however, in how we reach that result.

Judge Williams concludes that we should uphold the notice-reading remedy the Board imposed because HTH has been given "the option of punting the task to a Board employee." Maj. Op. 17. Although earlier cases cast doubt on the propriety of singling out a particular corporate officer and "mak[ing] him sing," *see Conair Corp. v. NLRB*, 721 F.2d 1355, 1402 (D.C. Cir. 1983) (R.B. Ginsburg, J., dissenting), allowing a Board representative to read the notice instead appears to alleviate his concern. *See* Maj. Op. 16–17 (citing *NLRB v. S.E. Nichols, Inc.*, 862 F.2d 952 (2d Cir. 1988)). Judge Rogers would not rely on the Board-agent alternative in upholding the notice-reading remedy as Judge Williams does; she nonetheless finds it a reasonable "compromise." *See* Rogers Op. 3, 5–6.

I disagree. In my view, the Board-agent alternative "creates a problem more severe than the one it supposedly solves." *Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO v. NLRB* (*IUE*), 383 F.2d 230, 233 n.5 (D.C. Cir. 1967); *see also Teamsters Local 115 v. NLRB*, 640 F.2d 392, 402 n.11 (D.C. Cir. 1981) ("We . . . continue to doubt the propriety of having a Board representative perform the reading."). As we explained in *IUE*, a Board representative reading the notice "put[s] the imprimatur of the Board on both a particular union's activities, as well as on union activities in general," 383 F.2d at 233 n.5, thereby compromising the Board's role as labor-law referee.[1]

---

[1] It is true that since *IUE* and *Teamsters* we have upheld a notice-reading remedy that included a Board-agent option and that

Judge Williams characterizes the imprimatur concern as "weak" because "the *substance* of the notice will make employees fully aware of how the Board has ruled" and "of which 'side' the Board has taken." Maj. Op. 16–17 (emphasis in original). But even if the notice's substance indicates "which 'side' the Board has taken" *in this case*, *see id.* at 17, when a Board agent stands up to castigate an employer in front of unionized employees, those employees are inevitably left with a perception of the Board as union enforcer, not neutral arbiter. A referee calling a foul is one thing; a referee calling a foul while wearing one team's uniform is quite another. In short, *who* reads the notice matters.

---

we did so "without even a nod to *IUE*." Maj. Op. 16 (discussing *Federated Logistics & Operations v. NLRB*, 400 F.3d 920, 929–30 (D.C. Cir. 2005)). My colleagues fail to mention, however, that we gave no "nod" to the Board-agent option, *period*. Other than a single reference made in describing the remedy imposed, the *Federated* court's analysis focused exclusively on whether the notice-reading remedy—that "a Federated management official" read the notice—was lawful. *See Federated Logistics*, 400 F.3d at 929–30. The court plainly did not approve the Board-agent option as my colleagues do here, *see* Maj. Op. 16–17; Rogers Op. 5–6, and as we discussed (and rejected) the Board-agent option in *IUE*, 383 F.2d at 233 n.5, and *Teamsters*, 640 F.2d at 402 & n.11. Indeed, the *Federated* court had no reason to do so inasmuch as the general validity of an "any-responsible-officer" notice-reading was not in question. We also acknowledged its validity in *Teamsters*, 640 F.2d at 404 (enforcing public reading only with "a responsible officer" of employer as reader), and even then-Judge Ginsburg, in her emphatic dissent in *Conair*, would have upheld the notice-reading remedy at issue there had "a responsible officer" been required to read the notice rather than a specific person, *see* 721 F.2d at 1401. Accordingly, the *Federated* court had no reason to comment on the propriety of the Board-agent option and I believe we should not read its failure to do so as a *sub silentio* endorsement thereof.

That said, I believe we are without jurisdiction to consider the validity *vel non* of the Board-agent option. The alternative is not part of the remedy the ALJ recommended and to which HTH originally excepted. Further, HTH did not move for reconsideration, objecting to the Board's modification of the remedy. Because we lack jurisdiction to consider an objection HTH has not first presented to the Board, *see* 29 U.S.C. § 160(e); *see also Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–66 (1982), I would not reach this portion of the remedial order.

And my colleagues' conclusion that HTH's original objection to the ALJ's remedy preserves its challenge to the notice-reading remedy as modified by the Board—including the Board-agent alternative—is, in my view, mistaken. *See* Maj. Op. 7–8. Although "an imprecisely drafted objection" *may*, when read in context, operate to preserve otherwise unobjected-to issues, *see id.* at 8 (quoting *Consol. Freightways v. NLRB*, 669 F.2d 790, 794 (D.C. Cir. 1981)), we have emphasized that a party's "single reference to the 'excessive breadth' of a remedy *with multiple parts* is insufficient to satisfy section 10(e) because it failed to give the Board ' "adequate notice" of the argument it seeks to advance on review,' " *Highlands Hosp. Corp. v. NLRB*, 508 F.3d 28, 33 (D.C. Cir. 2007) (emphasis added) (quoting *Am. Postal Workers Union v. NLRB*, 370 F.3d 25, 28 (D.C. Cir. 2004)). I see no reason why the same proposition should not hold where, as here, the notice-reading remedy itself has "multiple parts." *See id.* Simply because one part—singling out a specific reader—was objected to as extraordinary does not mean all additional requirements or alternatives added by the Board post-objection are covered by it.

This is especially true if (again, as is the case here) the remedy's "multiple parts," *id.*, address different concerns. As

my colleagues recognize, our earlier cases questioned the propriety of the individual-reader designation because of the affront to the reader's dignity. *See* Maj. Op. 10–16. In contrast, the Board-agent option is problematic because it compromises the Board's neutrality in the eyes (and to the ears) of the attending employees. *See supra* at 1–2. The same is true of the Board's other modifications of the notice-reading remedy—*i.e.*, the requirement that supervisors attend and that a Union official be allowed to be present; they raise different issues. *See* Maj. Op. 8. I agree, then, with my colleagues when they say these other "*additions . . .* seem distinctive," *id.* (emphasis in original), and that we are jurisdictionally barred from considering them, *id.* at 17. In my view, the Board-agent alternative is no different: it was added *sua sponte* by the Board, implicates concerns different from the general notice-reading remedy originally imposed and HTH never objected to it. Accordingly, I would hold that we are jurisdictionally barred from considering HTH's challenge to this alternative and therefore we must enforce it.

In my view, the only portion of the remedy properly before us is that a notice be read publicly and that Minicola be the one to read it. Judge Williams ably summarizes this remedy's history in our circuit, *see* Maj. Op. 10–16, and, for the reasons he colorfully describes, *see id.* at 13–16, I am similarly troubled by the prospect of singling out a particular individual for a public "confession of sins," *Conair Corp.*, 721 F.2d at 1401 (R.B. Ginsburg, J., dissenting), no matter the egregiousness of his conduct. Nevertheless, our more recent cases have upheld such a remedy if the Board identifies a "particularized need" for it, as evidenced by "substantial links" between the reader's conduct and the unfair labor practice. *United Food & Commercial Workers Int'l Union, AFL-CIO v. NLRB*, 852 F.2d 1344, 1348 (D.C. Cir. 1988); *cf. Federated Logistics*, 400 F.3d at 938 (Henderson, J.,

dissenting).  Given that Minicola was the primary source of HTH's unfair labor practices,[2] our precedent—my concerns therewith notwithstanding—compels me to uphold the remedy.  Because, as noted, we lack jurisdiction to consider HTH's challenges to any other aspect of the notice-reading remedy, I concur in the judgment denying HTH's petition on this issue.

My reasoning diverges from my colleagues' on a second point as well.  After concluding "that it is wrong to speak of agencies as having *any* inherent authority," Maj. Op. 19 (emphasis in original), my colleagues then analyze "whether § 10(c) implicitly authorizes fee shifting based on bad faith," *see id.*  They ultimately conclude that section 10(c) does not by implication authorize fee shifting because fee shifting is punitive and the Board's power is exclusively remedial.  *Id.* at 19–21.

In my view, analyzing whether section 10(c) "implicitly" authorizes fee-shifting is unnecessary—and jurisprudentially out of bounds—to resolve this case.  The Board relied exclusively on its purported "inherent authority" to award litigation expenses, not on section 10(c) or any other statutory authority.  *See HTH Corp.*, 361 N.L.R.B. No. 65, at 4 & n.16

---

[2]  According to the ALJ's findings, which the Board adopted and HTH does not dispute here, Minicola was involved in almost all of the unfair labor practices: he wrongfully fired an employee, *see HTH Corp.*, 361 N.L.R.B. No. 65, at 37–41 (Oct. 24, 2014), wrongfully barred Union representatives from the Hotel's premises, *id.* at 41–43, and wrongfully made unilateral changes to employee policies, *id.* at 44–45.  In perhaps the most extreme episode of Minicola's behavior discussed by the ALJ (and specifically noted by the Board, *id.* at 2 n.10), when the Union informed Minicola that his unilateral changes violated a court injunction, "Minicola replied, 'F*** the judge.  He's wrong.' "  *Id.* at 45.

(Oct. 24, 2014) ("Because the Board may award litigation expenses against a party who engages in bad-faith conduct based on its inherent authority to control its own proceedings, it is unnecessary to pass on whether it may alternatively do so under its Sec. 10(c) remedial authority to effectuate the policies of the Act."). And as my colleagues recognize, Maj. Op. 18–19, no such extra-statutory "inherent authority" exists, as the two dissenting Board members—with admirable modesty—recognized, *see HTH Corp.*, 361 N.L.R.B. No. 65, at 21 (Member Miscimarra, dissenting in part); *id.* at 26–27 (Member Johnson, dissenting in part). Contrary to the Board's apparent belief, it is *not* a court of law or equity; it exercises only the powers granted by the Congress. *See, e.g.*, *Int'l Union of Elec., Radio and Mach. Workers, AFL-CIO v. NLRB*, 502 F.2d 349, 352–53 n.* (D.C. Cir. 1974) (opinion of MacKinnon, J.) ("Absent statutory authority, courts may, in the exercise of their inherent equitable powers, award attorney fees in certain carefully circumscribed situations where overriding considerations indicate the need for such a recovery. . . . An administrative agency possesses no such inherent equitable power, however, for it is a creature of the statute that brought it into existence; it has no powers except those specifically conferred upon it by statute." (citation and quotation marks omitted)). Accordingly, I would hold that the Board has no "inherent authority" to award attorneys' fees, period; in my view, that is all that need be said to justify granting HTH's petition on this issue.[3]

---

[3] I fully concur in my colleagues' conclusions, *see* Maj. Op. 6–7, regarding our lack of jurisdiction to consider HTH's challenges to the other remedies the Board modified or imposed *sua sponte*—reimbursement of Union bargaining costs, general notice publication, Union visitation rights and enhancements to the notice-posting and notice-mailing remedies. I also fully concur in my colleagues' conclusion that HTH's challenge to the litigation-

expenses requirement is preserved under the futility exception. *See id.* at 9; Rogers Op. 1–2.

ROGERS, *Circuit Judge*, concurring in part, concurring in the judgment.

**I.**

Section 10(e) of the National Labor Relations Act limits the court's jurisdiction to issues that have been presented to the Board. *See Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–66 (1982). In cases where an issue is raised *sua sponte* by the Board, parties are generally required to file a motion for reconsideration in order to preserve it. *Spectrum Health-Kent Cmty. Campus v. NLRB*, 647 F.3d 341, 349 (D.C. Cir. 2011). A narrow exception exists in "extraordinary circumstances," 29 U.S.C. § 160(e), where a motion for reconsideration would be futile. Thus, in *NLRB v. FLRA*, 2 F.3d 1190, 1195 (D.C. Cir. 1993), although there was no objection to the Federal Labor Relations Authority's determination that a proposal was an "appropriate arrangement," the court nevertheless concluded that the issue was reviewable. The FLRA had previously and frequently held identical proposals were "appropriate arrangements" and had raised the issue *sua sponte*. In those circumstances, the court held that a rehearing petition would have been "patently futile." *Id*. at 1196–97.

So too, here. The Board *sua sponte* required HTH Corporation to reimburse the union and the Board's general counsel for their attorneys' fees and litigation costs. *HTH Corp.*, 361 NLRB No. 65 (2014). For more than a decade, the Board has rejected the objections that HTH now raises, namely, that the Board lacks "inherent authority" to order reimbursement of litigation expenses. *See, e.g.*, *Camelot Terrace*, 357 NLRB No. 161, at \*6 (2011); *Teamsters Local Union No. 122*, 334 NLRB 1190, 1193 (2001); *Alwin Mfg. Co.*, 326 NLRB 646, 647 (1998), *enforced*, 192 F.3d 133 (D.C. Cir. 1999); *Lake Holiday Manor*, 325 NLRB 469, 469 & n.5 (1998). The Board's decision here

followed only three years after *Camelot Terrace*, in which the Board ruled that notwithstanding its lack of statutory authority to order the payment of attorneys' fees, *see Unbelievable, Inc. v. NLRB*, 118 F.3d 795 (D.C. Cir. 1997), it could award fees "as a function of the inherent authority to preserve the integrity of its processes." *Camelot*, 357 NLRB at *8. Indeed, the Board's brief to this court reaffirms that it adheres to its long-standing position that it possesses inherent authority when a respondent engages in the type of egregious conduct in which the Board found HTH has engaged for a decade. *HTH Corp.*, 361 NLRB No. 65 at *1 & n.4. Under these circumstances, I concur in holding that it would have been futile for HTH to move for reconsideration by the Board, and the court has jurisdiction to consider HTH's challenge to the Board's *sua sponte* imposition of attorneys' fees and costs.

On the merits, I concur in granting the petition with respect to attorneys' fees and costs in light of *Unbelievable*, 118 F.3d 795, which must be read in view of *Nepera Chemical, Inc. v. Sea-Land Service, Inc.*, 794 F.2d 688, 694 n.56 (D.C. Cir. 1986). *See also Fox v. Vice*, 131 S. Ct. 2205, 2213 (2011); Op. at 18–21; *id*. at 9–10.

## II.

The Board's order directing that either a company Vice President or, at HTH's option, a Board representative read the Board's order is a permissible exercise of the Board's broad remedial authority. *See Federated Logistics & Operations v. NLRB*, 400 F.3d 920, 929–30 (D.C. Cir. 2005).

A little history is in order. *See* Op. at 10. In *International Union of Electrical, Radio & Machine Workers v. NLRB*, 383 F.2d 230, 233 (D.C. Cir. 1967) ("*IUE*"), the court rejected a notice-reading remedy in which the Board had ordered the

employer to read the Board's order to its employees on company time. The court concluded that this "fourth promulgation" of the Board's order was "inappropriate to achieve the sought-after goal of dissemination of information concerning employees' rights." *Id*. at 232–33. The court stated "further" that the public reading would be humiliating and degrading to the employer and "undoubtedly" have a lingering effect on future management-union relations. *Id*. at 233. It also noted a circuit split on the issue. *Id*. at 233 n.5. Although acknowledging the possibility of extreme conduct that would justify the novel and drastic step, the court concluded that "[t]he ignominy of a forced public reading and a 'confession of sins' by any employer, any employee, or any union representative makes such a remedy incompatible with the democratic principles of the dignity of man." *Id*. at 234. One member of the court, however, would have adopted a compromise, allowing the employer to decide to have a representative of the Board read the Board's order, or would have remanded for the Board to consider this compromise. *Id*. (Wright, J., concurring in part and dissenting in part) (citing *J.P. Stevens & Co. v. NLRB*, 380 F.2d 292, 305 (2d Cir. 1967)).

The Board subsequently determined that in some instances the public reading served a permissible purpose. This change was addressed in *Teamsters Local 115 v. NLRB (Haddon House)*, 640 F.2d 392, 402–03 (D.C. Cir. 1981). The Board, while acknowledging judicial doubts about the propriety of such an order, had concluded that where the employer had carried out an anti-union campaign there were circumstances where the employer itself must give its employees "reassurances that this campaign will end." *Id*. at 402. Although other circuits generally approved the public reading order once the Board representative option became routine, *see id*., the Board concluded that would not suffice in these circumstances. The court acknowledged the Board's broad remedial powers and the court's limited review, *see id.* at 399 (citing *NLRB v. Gissell*

4

*Packing Co.*, 395 U.S. 575, 612 n.32 (1969); *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216 (1964)), and stated:

> The Board's remedy is admittedly strong medicine. But in the context of the severely chilling environment created by this Employer's unfair labor practices, we cannot say it was superfluous to the cure. This is not a mere "additional" promulgation of the notice's contents, but rather a deliberate attempt to alleviate the workers' fears about the Employer's intentions. The reading can do little to disrupt the already strained relationship between the Employer and the Union, and it may be of substantial benefit to the employees. Whether or not this hope is realized, we cannot say that the Board was wrong to make an effort in that direction. This court acknowledged in [*IUE*] that there were conceivably cases where the need for the remedy would outweigh its oppressiveness and justify the public reading order. We believe that this is such a case.

*Id.* at 402–03.

The court declined to enforce a "highly unusual" feature of the public reading order, however. It noted that the Board had singled out a company's chief executive officer to perform a public reading only once before, where the Board had emphasized the personal participation of the company president in the unfair labor practices. The court observed that, although "it was unnecessary to decide whether [such circumstances], or any circumstances whatsoever, could justify the startling innovation of the Board reading order directed at a specific individual," here "the Board did not make a careful analysis of the necessity for [the company owner and president] to undertake the reading, and the record suggests no such necessity." *Id.* at 403. The company president had personally performed only one

unfair labor practice while other members of management engaged in numerous others. *See id.* The court concluded the negative aspects of the order, as identified in this court's opinion in *IUE*, overwhelmed "the marginally greater impact" of having the company president read the order, and found it was "unjustified." *Id*. at 403–04.

Since *Teamsters*, the court, like our sister circuits, has enforced a Board order that required a notice reading where the employer was afforded the option of having the notice read by a Board representative. *See Federated Logistics & Operations*, 400 F.3d at 929–30. Alternatively, the court has enforced notice-reading remedies that single out a high official of the employer where the record indicates "a particularized need does exist and that the reading is necessary 'to dispel the atmosphere of intimidation created in large part by [the singled-out officer's] own statements and actions.'" *United Food & Commercial Workers Int'l Union v. NLRB*, 852 F.2d 1344, 1348 (D.C. Cir. 1988) (quoting *Conair v. NLRB*, 721 F.2d 1355, 1386–87 (D.C. Cir. 1983), and citing *IUE*, 383 F.2d at 234); *Teamsters*, 640 F.2d 233.[1]

---

[1]  In *United Food*, the court observed:

National labor law has undergone many changes from the early days of the Wagner Act. Throughout this period, courts have acknowledged the broad remedial discretion that the Board must have to effectuate the policies of the statute. Such discretion makes it difficult to provide bright-line limits on the remedies that the Board can utilize. As the decisions of this court in *Teamsters* and *Conair* demonstrate, unique and specific facts of a case will more often than not provide the measure that allows a remedy in one case and precludes it in another. Such are the vagaries of judicial review of the delicate fabric of our national labor law.

As this history indicates, there is no need to impugn the court's reconciliation of its precedent with the congressional design granting the Board broad power and discretion to devise remedies to effectuate the policies of the National Labor Relations Act. *See Gissell Packing Co.*, 395 U.S. at 612 n.32; *Fibreboard Paper Prods. Corp.*, 379 U.S. at 216. Because the Board's notice-reading order is consistent with our precedent enforcing the compromise option, there is no need to imply that the Board's judgment in specific egregious circumstances has abandoned democratic principles. *See* Op. at 15–16. The record supports the Board's conclusion that a notice-reading remedy was warranted by the egregious conduct of HTH and its Vice President's pervasive unlawful conduct over an extended period of time. *See* Op. 3–4. HTH has not challenged any factual finding by the Board.

Accordingly, I concur in part and concur in the judgment.

---

852 F.2d at 1349.